IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2015 Session

**STATE OF TENNESSEE v. VICKIE LYNN PERRY**

**Appeal from the Criminal Court for Knox County**
**No. 94181     Mary B. Leibowitz, Judge**

_____

**No. E2014-01088-CCA-R3-CD – Filed July 7, 2015**

_____

Defendant, Vickie[1] Lynn Perry, appeals her convictions for first degree murder and robbery, arguing: 1) that there is insufficient evidence to establish that she killed the victim while committing felony robbery; 2) that the State introduced improper evidence; 3) that the trial court improperly admitted evidence of a specific instance of conduct to impeach Defendant's character for truthfulness; and 4) that the State made improper remarks during its closing argument. After careful review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Vickie Lynn Perry.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Kevin James Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

---

[1] Defendant's first name was spelled as "Vicky" in this case's caption in the trial court, presumably because that was the spelling used in the indictment. It is also how Defendant spelled it for investigators during her interview and signed her name on the affidavit of indigency. However, "Vickie" was the spelling used in her notice of appeal, and we will use it throughout this opinion for convenience.

## I. Facts and Procedural Background

This is Defendant's direct appeal for her jury trial conviction of felony first degree murder, and resulting life sentence, from the Knox County Criminal Court. On April 6, 2010, the Knox County Grand Jury indicted Defendant of two counts of first degree felony murder and one count of robbery. The trial court arraigned Defendant and appointed counsel to provide representation. After several continuances because of Defendant's health, the trial court held a four-day jury trial that began on October 1, 2013.

Roe Tolliver, the victim, lived in South Knoxville on a "family farm" of nearly eight acres. He was seventy-seven years old. His wife stayed in a nursing home so he lived alone until he met Defendant. After developing a friendship, they agreed to a living arrangement. Mr. Tolliver allowed Defendant to move into his house in exchange for cooking and cleaning. On occasion, Mr. Tolliver helped support Defendant financially.

Mr. Tolliver's fifty-year-old nephew, Larry Graham, lived in a house approximately three hundred feet away from Mr. Tolliver's residence. There is an unobstructed view between the two houses such that Mr. Graham could see vehicles coming and going from Mr. Tolliver's house. Mr. Tolliver owned three trucks: a 1998 red and silver Dodge Ram, a 2008 red Dodge, and an inoperable Dodge in his driveway.

When Mr. Tolliver returned home from work on Tuesday, January 26, 2010, Mr. Graham went to Mr. Tolliver's house to cut some trees for Mr. Tolliver. Mr. Tolliver was sitting on the front porch, and Defendant was inside the house. Mr. Tolliver told Mr. Graham to cut the trees another time because it was getting dark. Mr. Graham went home to retrieve some cigarettes and to stow his saw, and he then returned to Mr. Tolliver's house after five or ten minutes.

When Mr. Graham returned, the door to Mr. Tolliver's house was locked, which was unusual. Mr. Graham and Mr. Tolliver spent much time together and were so comfortable with each other that they had "an open-door policy" with each other's homes. Mr. Tolliver rang the doorbell, and Defendant opened the door. She told Mr. Graham that Mr. Tolliver was taking a shower and was tired. Mr. Graham agreed to visit Mr. Tolliver the next day instead. Defendant then mentioned that she and Mr. Tolliver were contemplating a "little vacation" to Myrtle Beach because he had been working "quite a bit." She said that they would tell Mr. Graham if they decided to leave. That was the last day that Mr. Graham saw Mr. Tolliver alive. Mr. Graham had no further communication or interaction with Mr. Tolliver after January 26th.

Kenneth Thornton testified that he owned several residential rental properties. He knew Mr. Tolliver for fifteen to twenty years before he died. Mr. Thornton regularly hired Mr. Tolliver to do maintenance work on his rental properties. Mr. Tolliver was an

"extremely good" worker who was "always reliable." During the last week of January 2010, Mr. Tolliver was doing a job for Mr. Thornton. Mr. Tolliver worked Monday, January 25th, through Wednesday, January 27th. As he left work on Wednesday, around 3:30 p.m., Mr. Tolliver said, "See you tomorrow," to Mr. Thornton. A week or two of work remained to be completed, and Mr. Tolliver did not make any indication that he would not finish the job. Mr. Tolliver also did not mention taking a vacation.

Joey Lundy testified that he was Mr. Tolliver's neighbor and childhood friend. Mr. Lundy was helping Mr. Tolliver with the job for Mr. Thornton. Mr. Tolliver would drive Mr. Lundy to and from work in his 1998 Dodge Ram truck. On Wednesday, January 27th, Mr. Tolliver took Mr. Lundy home. Mr. Lundy expected them to return to work the next day, although Mr. Tolliver complained that his back hurt. Mr. Tolliver did not mention taking a vacation.

On Thursday, January 28th, between 6:30 a.m. and 7:00 a.m., a woman called Mr. Thornton and told him that Mr. Tolliver was sick and would not make it to work. This was unusual because Mr. Tolliver would call Mr. Thornton personally if he was unable to work. The same woman called back later during the day and asked for Mr. Tolliver's compensation for the three days he worked that week. This was also unusual because Mr. Thornton normally paid Mr. Tolliver at the end of the week. Mr. Tolliver never asked for an advance payment. However, Mr. Thornton put cash in an envelope with Mr. Tolliver's name on it, and Mr. Lundy picked it up on Thursday afternoon. Mr. Thornton did not know Defendant.

On Thursday morning, Defendant called Mr. Lundy and told him that Mr. Tolliver was sick. She asked Mr. Lundy to pick up Mr. Tolliver's pay from Mr. Thornton. That was the first time that Defendant called Mr. Lundy. Mr. Lundy picked up the money from Mr. Thornton and drove to Mr. Tolliver's house. Defendant answered the door and said that Mr. Tolliver was asleep. Mr. Lundy gave Mr. Tolliver's money to Defendant and then left. He never saw Mr. Tolliver again.

A few days later, Mr. Graham noticed that the 2008 Dodge truck was not at Mr. Tolliver's house. He assumed that Mr. Tolliver and Defendant went on vacation without notifying him. Mr. Tolliver did not leave his home often and when he did so it was not for more than a few days.

When there was no contact from Mr. Tolliver by Saturday, Mr. Graham called Mr. Tolliver's phone. There was no answer. Mr. Graham tried again for several days, but Mr. Tolliver did not answer his phone or return a call to Mr. Graham. On Tuesday or Wednesday of the following week, Mr. Graham became concerned and called Defendant's phone. She also did not answer and did not return his call.

On the following Saturday, February 6, 2010, after lunchtime, Mr. Graham went to investigate. The doors of Mr. Tolliver's house were locked, so Mr. Graham used a ladder to climb through an unlocked window of the master bedroom. Inside, there was a "big fifth tequila bottle top busted" on the floor. The door to the hallway and the door to the adjoining bathroom were closed. The bathroom exhaust fan was running. Mr. Graham turned the handle of the bathroom door, which was not locked, but the door would not open. Mr. Graham thought someone may have been inside the bathroom, so he stepped away from the door and called out. No one answered. After a few minutes, Mr. Graham pushed firmly on the bathroom door, and it began to open. Mr. Graham saw that his uncle's body was lying on the floor with his legs against the door. Mr. Tolliver appeared to have been dead "for a long time" because his body was "black all over." There seemed to be wounds on his body.

Mr. Graham proceeded to check all of the rooms and closets inside the house to ensure that no one else was inside. He left the house and immediately called Kevin Tolliver, his cousin and Mr. Tolliver's youngest son.[2] He then called 911, and law enforcement arrived quickly.

Around 7:30 p.m., on February 6th, Mr. Graham received a phone call from Defendant. During the brief conversation, she said, "I was just calling to see [if] anybody [has] been looking for me or anything like that." When Mr. Graham asked why someone would be looking for her, Defendant replied, "I had just heard that the law was looking for me. Have you seen them over at Roe's or anything?" Mr. Graham denied that the police were at Mr. Tolliver's house because he did not want "to spook her." Defendant said that she would "probably" call back later. Mr. Graham notified the police that Defendant had just called him.

Twenty or thirty minutes later, Defendant called Mr. Graham again. He answered the call, and Defendant said, "I just called to see if you'd heard anything else." Mr. Graham said he had not. He then asked Defendant, "Y'all all right? Y'all doing okay?" Defendant answered affirmatively. Mr. Graham asked if Defendant and Mr. Tolliver went to the beach. She said that they had but were presently "up at her sister's in Indiana" and would return home "in the next couple of days." Mr. Graham told her that he would call her if he noticed anything "going on."

After learning of Mr. Tolliver's death, Kevin gathered his siblings at Mr. Graham's house. Kevin overheard Mr. Graham on the phone with Defendant and heard Defendant tell Mr. Graham that she and Mr. Tolliver were vacationing in Indiana.

---

[2] Because he has the same last name as his father, we will refer to him by his first name for clarity. We intend no disrespect thereby.

Detective Randall Crisp of the Major Crimes Unit of the Knox County Sheriff's Department testified that he was the lead detective dispatched to Mr. Tolliver's home on the afternoon of February 6, 2010. As he entered the front door of the house, he could smell the decomposition of Mr. Tolliver's body. He immediately declared Defendant a missing person because he did not know whether she was involved. Detective Crisp began tracking the location of Defendant's cellphone with assistance from her cellular service carrier. Defendant's phone was determined to be in Straw Plains. There was no cellphone date supporting Defendant's location in Indiana as she reported to Mr. Graham.

Detective Crisp learned that Defendant may have been with Jimmy Dunn, who frequented a particular gas station in Straw Plains. On February 7, 2010, Detective Crisp and a team went to the gas station and began surveillance. After approximately an hour, Mr. Dunn and Defendant arrived. The officers transported Mr. Dunn and Defendant to a law enforcement facility for questioning. Defendant signed a Waiver of Rights form, and Detective Crisp and Detective Brad Hall interviewed her.

Defendant said that she lived on Deadrick Road with Mr. Tolliver, for whom she was a caretaker. She explained that she had gotten into a fight with Mr. Tolliver, which happened often. The fight began because Mr. Tolliver wanted to go to Walgreens to get Viagra pills so that he could have sex with Defendant. Defendant refused because she did not want to have sex with him anymore. Mr. Tolliver told Defendant that she would have to move out of his house if she did not agree, and he threatened that he would not allow her to take her belongings with her.

Eventually, the argument became physical as the couple moved between the kitchen and their bedrooms upstairs. Mr. Tolliver became angry and began pulling Defendant's hair. Initially, Defendant denied hitting Mr. Tolliver with a glass bottle, but eventually she admitted that, at one point, while Mr. Tolliver sat on his bed in the master bedroom, Defendant hit him in the back of the head with a tequila bottle.[3] The blow did not render Mr. Tolliver unconscious, and he approached Defendant. Mr. Tolliver produced a knife with a yellow handle from a black sheath and stabbed Defendant's forearm.[4] Defendant disarmed the knife from Mr. Tolliver and then stabbed him repeatedly with it because she thought he was going to kill her.[5] Mr. Tolliver fell down

---

[3] Defendant gave conflicting statements about whether she hit Mr. Tolliver with the bottle before or after she stabbed him with the knife.

[4] At times during the interview, Defendant referred to two different knives being involved in the altercation.

[5] At times during the interview, Defendant said that the victim ran into the knife and injured himself, but she also admitted that she did use the knife to stab him.

on the floor near his bed, and then he went into the bathroom, shut the door, and began running water.[6]

Defendant left the master bedroom and returned to her bedroom. She took a bath and washed her clothes. She called an acquaintance and told him what happened. At some point, she took some pills and went to sleep. When she awoke the next morning, Defendant found Mr. Tolliver naked and on the floor. She did not know what to do, but she did not attempt to rouse Mr. Tolliver or call for medical assistance.

Defendant gathered her clothes and purse and then gathered various items from Mr. Tolliver's home, which she believed were valuable enough to sell. Defendant remembered taking a black rifle, a weed eater, Mr. Tolliver's wallet containing $15, a vacuum, a hunting light, a pair of tennis shoes, and a leaf blower. She left with Mr. Tolliver's 2008 Dodge truck and went to Mr. Dunn's trailer. Defendant did not tell Mr. Dunn what happened with Mr. Tolliver. Defendant told the investigators that she left the yellow-handled knife in Mr. Dunn's bedroom underneath a pillow on the bed.

Because the title to the 2008 Dodge truck was inside the vehicle and already signed, Mr. Dunn sold the truck to an individual named "Jay" for cash and a "camper." Mr. Dunn gave Defendant $5,000 from the transaction, which she instructed Mr. Dunn to use to buy cocaine. Mr. Dunn eventually sold most of Mr. Tolliver's belongings. Defendant stayed high with Mr. Dunn for the next few days before they were apprehended by the police. Defendant also said that, the night before the incident, she smoked crack in Mr. Tolliver's house with a man named Fred Davis while Mr. Tolliver slept.

Defendant's only injury was to the underside of her right forearm. The wound appeared to be a few days old at the time of the interview.

The 2008 Dodge truck was located off of Electric Avenue in West Knoxville with a broken taillight and without a license plate. Mr. Graham did not notice any damage to the 2008 Dodge before January 26th. According to Mr. Graham, Defendant did not drive Mr. Tolliver's trucks. If she needed to go somewhere, such as work, Mr. Tolliver would drive her.

Officer Mike McMahan went to Mr. Dunn's mobile home located on Stoney Point. There was also a Fleetwood RV camper on the property. The camper bore the license plate of Mr. Tolliver's 2008 Dodge truck. Mr. Tolliver's wallet and driver's

---

[6] There is no transcript of Defendant's statement in the record, but we have reviewed the video recording of Defendant's statement. This summary comes from that recording. We note that Defendant did not provide a coherent narrative of what transpired that night and often gave inconsistent statements. Various portions of the interview are inaudible on the recording. Any ambiguity or inaccuracies in this summary are reflective of the nature of the evidence.

license were located inside a cabinet underneath some bedding inside the mobile home. There was no money in the wallet. Defendant's black leather purse was found next to the bed. A set of keys to the 2008 Dodge truck and a pocket watch that belonged to Mr. Tolliver were inside the purse. One of the keys had what appeared to be a blood stain. In the bed of a blue pickup truck that belonged to Mr. Dunn was a green Hoover vacuum cleaner that belonged to Mr. Tolliver and a pair of Nike tennis shoes.

A filleting knife with a yellow handle was underneath a blue pillow against the headboard of the bed. The blade had a blood stain on it, and the pointed tip of the narrow blade was bent. The blood matched Mr. Tolliver's. The touch DNA, or skin cells, recovered from the handle matched Defendant. Touch DNA is left on an object that has been touched or gripped with force.

Detective Crisp learned that Mr. Dunn sold several of the items that Defendant took from Mr. Tolliver's house to someone who lived on Jillian Drive.[7] Officer Angie Varner recovered the following items from the porch of a residence there: a chainsaw, a weed eater, a .22 caliber rifle, and large hunting lights with battery packs. The items were identified by Mr. Tolliver's family.

Sergeant Mackenzie Alleman of the Knox County Sheriff's Office, Forensic Services Division, testified that she was the lead crime scene investigator dispatched to Mr. Tolliver's home in the afternoon of February 6, 2010. When she arrived, the house was "neat and tidy" and "very clean," and there were no signs of forced entry.

Upstairs, there was a bedroom that appeared to have been used by a female. There were no sheets on the bed, but there was a purse with its contents strewn on the mattress. A piece of paper contained Defendant's name and the street address of Mr. Tolliver's home.

There were several small reddish-brown stains throughout the hallway.[8] There were similar spots on the "wall[] and door frames" of the laundry room. There was what appeared to be a small blood stain on the rim of the washing machine. There was what appeared to be a blood stain on the sink countertop inside the hallway bathroom. There were similar spots on the door frame of the bathroom. No trashcan was in the bathroom, which seemed odd to Sergeant Alleman.

Nothing appeared out of place in the master bedroom. There was a blood-stained sock on top of a pile of clothes on the dresser. A pair of blue work pants was on the

---

[7] This address was alternatively referred to as Jillian Lane.

[8] The Tennessee Bureau of Investigation ("TBI") did not test the samples recovered from the spots in the hallway to confirm that they were blood. However, Detective Crisp testified that, in his experience, these spots appeared to be blood.

bedroom floor. A videotape was found between the mattress and box springs of the master bed. The video depicted Mr. Tolliver and Defendant having sex. There was a glass pipe used for smoking narcotics, such as crack cocaine, inside a drawer of the bedside table.

There were several small shards of broken glass from a liquor bottle underneath one of the windows and several larger pieces of glass underneath the bed. There were also several small shards of broken glass underneath a bedside table. Defendant's fingerprints were identified on glass from the tequila bottle.

Mr. Tolliver's body was discovered with a pillow underneath his head and a quilt over his left shoulder, partially covering the left side of his body. He wore only a white long sleeve shirt. There were no holes or knife markings in the white shirt. The pillow, blanket, and shirt were stained with blood. There were blood stains on the bathroom cabinets and the edge of the counter. There was a mixture of blood and feces on the bathroom floor. There were blood stains on the interior of the shower. A metal wrist watch was inside the tub. There was a shard of broken glass underneath the blanket that covered the left side of Mr. Tolliver's body.

There was a trashcan next to the bathtub that contained several pieces of clothing soaked with blood. A t-shirt inside the trashcan contained cuts in the fabric of the front chest area of the shirt and "down the left-hand side towards the armpit area and down the side of the shirt." There were "smaller cuts up in the left shoulder, in the left neck area," and in the back left side area. These cuts were consistent with the injuries to Mr. Tolliver's body. There were also two socks and a pair of men's underwear in the trashcan. A gray sweatshirt with cuts matching the t-shirt was also inside the trashcan.

In the kitchen there was a "counter island" that contained several bottles of medication prescribed to Mr. Tolliver, including Viagra. A hard plastic knife sheath was in the third drawer from the right of the island. The sheath fit the yellow-handled knife. The kitchen's silverware drawer was slightly ajar.

There were red pieces of a broken taillight at the base of a tree near the driveway and embedded within the trunk of the tree. There was an empty, crumpled carton of menthol cigarettes near the tree. The TBI determined that the taillight fragments matched the truck. There was what appeared to be a blood stain on the underside of the center console that was flipped up between the two front seats. There was a similar spot on the interior of the driver's side door.

Dr. Steven Cogswell testified that, during his work on this case, he was Deputy Chief Medical Examiner at the Regional Forensic Center in Knoxville. On February 8, 2010, he conducted an autopsy on Mr. Tolliver's body. The top of Mr. Tolliver's head had two small lacerations surrounded by bruising. These wounds were blunt force

injuries, not sharp force injuries. There was a "fair amount of injury" to the left eyebrow and area surrounding the left eye. The right side of the face was covered in one large bruise. The center of the forehead had a few smaller lacerations and abrasions. All injuries to the head and face were blunt force injuries.

There was a bruise on the left, frontal area of the brain that resulted from a blow to the head. There were similar injuries on the top and right side of the brain. Given these injuries, there were "a minimum of three impacts to the head and probably more to cause all of the separate distinct injuries." There were no skull fractures or bleeding around the brain. The result of these injuries would have been some degree of swelling.

Mr. Tolliver's head wounds were "not a very serious injury that would be expected to, in and of itself, result in death." Due to the extent of decomposition to Mr. Tolliver's body, it was difficult to specify the precise effect of these injuries once they occurred. Mr. Tolliver may or may not have lost consciousness. These injuries contributed to Mr. Tolliver's death and could have caused his death, depending on the severity of their effects. The head wounds were consistent with a blow from a rectangular liquor bottle.

Mr. Tolliver sustained multiple stab wounds to his chest, left armpit area, and the lower left margin of the rib cage. Some of the stab wounds only penetrated the skin and muscle of the chest wall. Other stab wounds went into the chest cavity; both the right and left lungs were punctured. The lower chest wounds went into the abdomen and punctured the stomach. One of the wounds directly to the left armpit, severed the brachial vain which caused "a significant amount" of low pressure bleeding. Low pressure bleeding meant that blood would not have been "spurting" from the vein. There were two wounds to Mr. Tolliver's left wrist and forearm, one was a cut and the other was a laceration. There were at least eight total wounds to Mr. Tolliver's torso and left arm.

Mr. Tolliver's lungs contained almost a quart of blood. For underlying conditions, he had an enlarged heart, with a previous four-vessel bypass, and significant heart disease. Mr. Tolliver's death was ultimately caused by a combination of his underlying conditions, blood loss from the stab wounds, and brain swelling from the blunt force wounds. His death was a homicide. Mr. Tolliver's wounds would not have caused a rapid death, but likely occurred after five to ten minutes or longer. Had Mr. Tolliver received medical care "relatively quickly," he "certainly could have survived these injuries."

Mr. Tolliver's body did not show any offensive wounds, but the two wounds to his left wrist and forearm were typical defensive wounds. The stab wounds on the left side of the body are consistent with a forehanded strike from the right hand of the attacker while directly facing the victim and also consistent with a backhanded strike from the

right hand of the attacker while side by side with the victim. Dr. Cogswell could not determine which of Mr. Tolliver's wounds were inflicted first. There were no injuries to the backside of Mr. Tolliver's body.

The toxicology report results were negative for controlled substances, such as cocaine. The blood alcohol content ("BAC") was .05, which was a common level for a body with such a degree of decomposition as a byproduct of the decomposition process.

Mr. Graham described Mr. Tolliver as a "gentle," "polite," and "kind-hearted" person, who was also "easy-going" and "laidback." Kevin Tolliver described his father as "soft-spoken" and non-confrontational. Mr. Tolliver had some hearing loss and took medication to control his blood pressure and cholesterol levels.

Mr. Tolliver did not deposit money at a bank. He carried large sums of money, thousands of dollars, on his person, and his wallet was never empty. He paid cash for all purchases and did not have a credit card.

Historically, Mr. Tolliver had a good relationship with all of his children, who helped take care of him after he had heart surgery. However, after Defendant moved in, Mr. Tolliver's children eventually stopped going to visit him, although they previously did so frequently. After Defendant became involved, Mr. Tolliver began wearing jewelry and sweaters, which was contrary to the personal style he had displayed all of his life. He had a sign on his truck that stated, "Vicky." Defendant redecorated the house.

Eventually, the relationship between Mr. Tolliver and his children became strained. The Tolliver children "took offense" to Defendant moving into Mr. Tolliver's home to care for him because they had been diligently attending to Mr. Tolliver. Mr. Tolliver dismissed his children's expressed opinions that Defendant was not looking out for Mr. Tolliver's "best interest." The children became frustrated and aggravated with their father because it seemed "almost like he chose her over us." They also did not like that he let Defendant smoke and keep pets inside the house. Mr. Tolliver was not a smoker. When Kevin's son was born, he had a respiratory illness that would not permit him to be inside Mr. Tolliver's house, where Defendant smoked. Kevin told Mr. Tolliver that he would no longer be visiting Mr. Tolliver's home but that Mr. Tolliver could visit him, as long as Defendant did not accompany Mr. Tolliver.

Samantha and Nicole Veals are Defendant's daughters.[9] Before the incident, Samantha and her two children visited Defendant and Mr. Tolliver several times each week. Defendant frequently kept Samantha's son, Peyton, and her baby. Samantha described Mr. Tolliver as "very nice," but he did not speak much, although he interacted

---

[9] Because the witnesses share the same last name, we will refer to them by their first names for clarity. Again, we intend no disrespect thereby.

with Peyton. Nicole visited her mother approximately twice each week at Mr. Tolliver's house. She described Mr. Tolliver as an "all right person" who was not violent. There were no indications that he was abusive to Defendant.

Samantha knew that Defendant and Mr. Tolliver were romantically involved. Mr. Tolliver treated Defendant "very good." Samantha testified, "Sometimes I thought [Defendant] loved him and sometimes I thought she was just using him" because "he would give her whatever she wanted." Mr. Tolliver "bought her a car and he gave her money." He "was taking care of her money-wise." Nicole said that Mr. Tolliver was "like a sugar daddy" to Defendant, that is, "someone [who] pays for sex." Nicole felt that Mr. Tolliver "possibly" loved Defendant, but she did not feel that Defendant loved him.

Samantha did not believe that Defendant was acting as a caretaker, although she would cook and clean for him and help administer his medicine. Defendant had a separate room in Mr. Tolliver's house, which Samantha had been inside. She knew that Defendant kept a bottle of tequila in her bedroom beside her nightstand.

Both Samantha and Nicole knew that Defendant also spent time with Mr. Dunn. Nicole said that Defendant would leave Mr. Tolliver to go get high on crack cocaine with Mr. Dunn and sometimes they would have sex.

Sometimes Defendant would "say that [Mr. Tolliver] was getting on her nerves" and "driving her crazy." On one occasion, at Mr. Tolliver's home, Defendant told Samantha that Mr. Tolliver "better stay in his room" because he was driving her "crazy" with his Alzheimer's. Defendant then said, "I'm going to hurt him." Shortly before Mr. Tolliver died, Nicole heard Defendant tell Samantha that Mr. Tolliver needed to "stay away from her or she was going to hit him in his head with something."

Samantha testified that Defendant "always talked about how she . . . wanted . . . it to be just her and have all this nice stuff." Defendant "said that she just wanted him gone, out of the way, and she spoke about the truck, said that Roe had given it to her." Defendant said that she was going to have a child with Mr. Tolliver and that he was "supposed to leave her all of his stuff." On one occasion, Defendant instructed Samantha to inquire into the cost of having "her tubes untied."

Approximately two weeks before Mr. Tolliver's body was discovered, Defendant asked Nicole to get Mr. Tolliver's 2008 Dodge truck registered in Nicole's name because Mr. Tolliver gave it to Defendant. Nicole knew that Defendant's car was unreliable and often inoperable. Defendant said that she possessed the title to the truck, but Mr. Tolliver would not give her the keys. Defendant said that she planned to "sneak" into Mr. Tolliver's bedroom while he was sleeping and take the keys. When Nicole refused to assist Defendant with the registration, Defendant acted "hateful" toward Nicole.

-11-

Before Mr. Tolliver was found dead, Samantha called Defendant's phone but did not get a response from her.

Defendant testified that Mr. Tolliver asked her to cook and clean for him after they met at the flea market. He paid her $200 every other month with free rent. Almost immediately after she moved in, their relationship became sexual because Mr. Tolliver began offering money for sex, which Defendant accepted. They made the sex tape together at his behest. Defendant was worried about catching sexually transmitted diseases from Mr. Tolliver because she saw younger women visiting his house to have sex. When Defendant did not want to have sex, Mr. Tolliver would get mad. Defendant did not leave Mr. Tolliver because she "didn't have any place to go." She couldn't stay with Jimmy Dunn because his house was "nasty." Mr. Tolliver eventually became physically abusive toward Defendant when she did not want to have sex. She did not call the police because she was scared of the police.

On the night of the incident, Defendant was making cornbread in the kitchen while Mr. Tolliver was drinking a beer at the kitchen table. They began having an argument about sex. They went to his bedroom to watch a movie and the argument continued. They both sat on the bed. The argument became physical when Mr. Tolliver began slapping Defendant because she would not have sex with him. She started hitting him. He then stabbed her in the arm with a knife, and the knife "stuck" in her arm. She pulled the knife out of her arm and then stabbed him in the shoulder. Then she hit him twice on the head with the bottle of tequila that was on his nightstand. She wanted to knock him out because she was scared that he would kill her. The bottle broke, and Mr. Tolliver got mad. He got off the bed then fell to the floor. He stood up and began moving around the bed toward Defendant. He ran into the knife that Defendant was holding. She began stabbing him but did not know how many times. He fell to the floor and crawled into the bathroom. She ran to her bedroom and locked the door. She was scared but did not call the police. She went to sleep. She explained that there were not always sheets on the bed in her bedroom because sometimes she slept in Mr. Tolliver's room.

The next morning, Defendant took a shower, got dressed, and went into Mr. Tolliver's bedroom. She looked into his bathroom and saw him. She touched him and knew that he was dead. She did not call anyone because she was scared. She left in his truck because her car was disabled. She went to Mr. Dunn's because that was the only place that she knew to go. She took all of the things from Mr. Tolliver's house because she needed some money and thought that she could sell some of those things. Mr. Dunn sold the truck for cash and a camper. He gave her $5,000 which she let him use to buy crack cocaine. He bought crack between fifteen and twenty times before they were arrested. They smoked all of the crack that he bought.

Defendant said that she called Mr. Tolliver's employer at the request of Mr. Tolliver, which happened before the fight. She gave the money in the envelope to Mr.

Tolliver. Defendant said that she lied to Mr. Graham on the phone about being on vacation with Mr. Tolliver because she did not want to talk to him. Defendant admitted telling her daughters that Mr. Tolliver was getting on her nerves, but she did not intend to kill him the night of the fight. Defendant denied asking Nicole to transfer the title to Mr. Tolliver's truck, but said that she had instead asked Nicole to put Defendant's own car in Nicole's name. Defendant denied killing Mr. Tolliver with the intent of taking his property.

The jury returned a guilty verdict on all three charges. The trial court merged the felony murder convictions and sentenced Defendant to imprisonment for life. The trial court sentenced Defendant to six years for the robbery conviction. Both convictions are to be served consecutively.

On May 29, 2014, the trial court denied Defendant's motion for a new trial. Defendant then filed a timely notice of appeal.

## II. Analysis

Defendant raises the following issues: 1) whether there was sufficient evidence to support her convictions for felony murder; 2) whether the State introduced improper evidence; 3) whether the trial court erred by admitting evidence of a specific instance of Defendant's previous conduct for impeachment of her character; and 4) whether the State made improper comments during closing argument.[10] The State contends that there is sufficient evidence to support Defendant's convictions and that neither the trial court nor the State committed reversible error during the course of the trial.

### A. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence. Specifically, Defendant argues that the evidence is not sufficient to prove beyond a reasonable doubt that she intended to steal the victim's property when she killed him. She maintains that the evidence shows at most that she only took the victim's property as an afterthought following his death. The State responds that there was sufficient circumstantial evidence for the jury to infer that Defendant killed the victim with the intent of stealing his property. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the appellate court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of

---

[10] We have rephrased these issues for clarity.

innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of first degree murder and robbery. Relevant to this case, first degree murder (or "felony murder") is "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . robbery [or] . . . theft" with "the intent to commit" robbery or theft. T.C.A. § 39-13-202(a)(2), (b). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a).

> To support a felony murder conviction, the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim. Although the intent to commit the underlying felony cannot be presumed from the act of committing the felony, a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to or concurrent with the killing.

*State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Buggs*, 995 S.W.2d 102, 107-08 (Tenn. 1999)).

To support her argument, Defendant analogizes this case to *State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992 (Tenn. Crim. App. Oct. 13, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007). In that case, the defendant sold marijuana to two buyers who paid for the drug with counterfeit money. *Id.* at *4. When the defendant saw that the money was fake, he requested the return of the marijuana. *Id.* The victims refused and proceeded to leave the room where the transaction occurred. *Id.*

The defendant chased the two buyers into a foyer and shot each buyer twice, while exclaiming, "That's what you get for stealing my f[--]king weed." *Id.* The defendant then retrieved his marijuana, ran out of the house, and fled in his vehicle. *Id.* He discarded his gun and the marijuana before being arrested. *Id.*

This Court reversed the defendant's conviction for first degree murder because the evidence was insufficient to prove beyond a reasonable doubt that the defendant killed the victims with premeditation. *Id.* The court observed that "no evidence was presented that the [defendant] made any declaration of intent to kill the victims, made any preparations to conceal the offense prior to the shooting, or had previously formed design or intent to kill the victims." *Id.* at *5. The court further observed that "there was no showing of hostility" prior to the killing and "no indication that [the defendant] procured the weapon for the purpose of killing the victims." *Id.* Noting that the defendant's possession and use of a firearm as well as his attempt to conceal evidence of the crime were not enough to prove premeditation, the court concluded that "nothing in the record indicates that the [defendant] was sufficiently 'free from excitement and passion' at the time the intent to kill was formed." *Id.* Instead, "the proof in the record reveals that the intent to kill was formed in passion following the theft of the [defendant]'s marijuana." *Id.*

We find *Brandon Compton* to be easily distinguishable from the facts of this case. There, the direct evidence of the killings came from eyewitnesses other than the defendant, and the factual account of what transpired was not at issue. In contrast, Defendant's self-serving statement and testimony are the only direct evidence in this record as to what happened the night Mr. Tolliver died. Defendant's argument is premised on the acceptance of her version of the incident; however, the jury was free to discredit all or part of Defendant's account of what transpired and rely instead on the circumstantial evidence in this case, which is substantial.

Both of Defendant's daughters testified, essentially, that they had the impression that Defendant was using Mr. Tolliver for money and a place to stay. Before his death, Defendant made threatening statements suggesting that she intended to hurt Mr. Tolliver, specifically by hitting him in the head with a tequila bottle, which was what she admittedly did before he died. Defendant also made greedy statements about Mr. Tolliver's possessions, many of which she later took from his home and let Mr. Dunn sell for cash, which they then used to buy drugs. Specifically, Defendant talked to Nicole about transferring the title to Mr. Tolliver's truck, which she claimed he had already given to her.

Further circumstantial evidence of Defendant's scheme to kill Mr. Tolliver to take his money and belongings comes from the fact that he inexplicably and uncharacteristically failed to show up for work. Defendant then called Mr. Tolliver's employer for his outstanding wages. She also told Mr. Graham in advance that she and

Mr. Tolliver may be gone on a vacation so that he would not be alarmed if they were not home for a period of time. This calculated conduct is inconsistent with Defendant's story that she panicked after she killed Mr. Tolliver during an argument and then fled with some of his things because she needed money.

Defendant's account is also belied by the physical evidence suggesting that she partially cleaned the house after she killed Mr. Tolliver by removing sheets from her bed, washing her clothes, stripping Mr. Tolliver's bloody clothes and putting on a clean shirt, opening the bathroom window, and turning on the exhaust fan. Defendant then failed to call for medical assistance or to report Mr. Tolliver's death. Instead, she proceeded to spend the next week or so using cocaine and not answering any phone calls from her daughter or Mr. Graham. Then, she lied to Mr. Graham during two phone conversations about being with Mr. Tolliver on vacation while the police were looking for her.

From all of the evidence, a rational jury could easily have believed that this was a poorly-planned and sloppily-executed murder for the purpose of stealing Mr. Tolliver's possessions for money to sustain Defendant's drug addiction. Defendant is not entitled to relief on this issue.

## B. False Evidence

Defendant's next issue is that "the State committed reversible error when it insinuated that [Defendant] was only around [Mr.] Tolliver's home at holidays to get gifts when in fact she lived there and the State knew it." To support this issue, Defendant recounts specific portions of the testimonies from Mr. Graham and Kevin Tolliver, and offers the following argument:

> It was only [Defendant]'s daughters who testified that [Defendant] was only around [Mr.] Tolliver on holidays. [Mr.] Tolliver's family, including his nephew who lived next door knew that was not true and their testimony showed it not to be true. An experienced prosecutor would have to have known that this was not a factual allegation. [Defendant] would suggest that these statements were made just to prejudice the jury against her.

The State responds that this issue is waived for failure to support it with sufficient argument and citation to authorities. Alternatively, the State construes Defendant's argument as being that the State presented false evidence, which the State denies occurred.

We agree with the State that this issue is waived. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7). Defendant fails to specify precisely what evidence she contends was

improperly admitted and does not provide any legal authority as the basis for her argument. Indeed, we cannot discern the gravamen of her complaint and decline to speculate. Accordingly, we deem this issue waived.

## C. Impeachment Evidence

Defendant also argues the trial court erred by admitting impeachment evidence of a specific instance of previous conduct because the prejudicial effect of the evidence "far outweighed" its probative value and also because "it did not do the analysis required to determine if the allegation should have been allowed in." The State maintains that this argument is waived because Defendant's appellate brief lacks citation to authorities and sufficient legal analysis. Additionally, the State argues that the trial court did not abuse its discretion by admitting this evidence or, alternatively, that any error was harmless.

On September 30, 2013, the day the jury was impaneled but before the trial began, the State filed a "Notice of Impeachment" in which it identified a police report regarding an incident on January 11, 2007. The police report states that Mr. Tolliver reported that he suspected Defendant of stealing a rifle and a DVD player from his house after she moved in with him. The trial court reserved ruling on the admissibility of this evidence. After the State rested its case-in-chief, Defendant objected to the State's use of this evidence to cross-examine Defendant. The State represented that it did not discover the report until the week preceding the trial, which was why it filed its notice of intent so late. Defense counsel asked the trial court to exclude the evidence because he had not had adequate time to investigate the alleged incident. The trial court ruled that the State could introduce the police report because "it involves whether or not Mr. Tolliver and [Defendant] got along." The trial court also observed that this evidence "cuts both ways" in that it could be beneficial to both parties.

During the State's cross-examination of Defendant, the following exchange occurred:

Prosecutor: Isn't it true that, in 2007, Mr. Tolliver called the Knox County Sheriff's Office to report a theft at his residence?

Defendant: Yes.

. . . .

Prosecutor: Did you steal a rifle from Mr. Tolliver in 2007 causing him to call the police on you?

Defendant: I'm not for sure.

During redirect examination, defense counsel asked Defendant if she was "ever charged with stealing a rifle from Mr. Tolliver?" to which Defendant replied, "No, I wasn't." The police report was not entered into evidence.

Tennessee Rule of Evidence 608(b) permits a party to cross-examine a witness about specific instances of conduct "for the purpose of attacking . . . the witness's character for truthfulness." Such conduct "may not be proved by extrinsic evidence," and the cross-examining party "is bound by the witness's answer." *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992). The following conditions must be satisfied before the trial court may permit the cross-examination:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;
>
> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution . . . ;
>
> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. . . .

Tenn. R. Evid. 608(b). "[A]n appellate court reviews a trial court's ruling under [Tennessee Rule of Evidence] 608(b) using an abuse of discretion standard." *State v. Reid*, 91 S.W.3d 247, 303 (Tenn. 2002).

In this case, the trial court followed all of Rule 608(b)'s requirements for admissibility of this evidence. As to the first requirement, the hearing was conducted outside of the jury's presence, and the police report provided a reasonable factual basis that the alleged conduct actually occurred. This Court has previously recognized that both theft and burglary are probative of truthfulness for purposes of impeachment. *See State v. Dishman*, 915 S.W.2d 458, 463-64 (Tenn. Crim. App. 1995) (burglary); *State v. Williams*, 645 S.W.2d 258, 260 (Tenn. Crim. App. 1982) (larceny). Regarding the second requirement, the alleged conduct was appropriately proximate because it allegedly occurred over three years prior to the indictment. As to the third requirement, more notice may have been desirable, but it was provided before the beginning of the trial and there did not appear to be any bad faith on the State's part. Even after the trial began, Defendant still had a few days to prepare for potential cross-examination about the incident. Because the alleged conduct involved Defendant, rather than another individual, Defendant should have been familiar with the details of the incident as contained in the police report and should not have needed much time to investigate the

circumstances of the incident. There was sufficient notice to eliminate any surprise to Defendant while giving her testimony.

Finally, Defendant alleges that the trial court failed to expressly balance the probative value and prejudicial effect of the evidence. However, we agree with the State that Defendant did not object to the admissibility of the evidence on this basis at trial. According to Rule 608(b)(3), the trial court was not required to perform a balancing inquiry because Defendant did not make such a request. Nonetheless, we find that any error in permitting this brief and limited questioning was harmless in light of all other evidence presented to the jury. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); *State v. Cannon*, 254 S.W.3d 287, 298-99 (Tenn. 2008) ("We apply a harmless error analysis to 'virtually all evidentiary errors.'"). Defendant did not admit to the alleged conduct and the report was not admitted into evidence.

### D. Improper Closing Argument

Defendant's last issue is that the State made improper remarks to the jury during its closing argument. Defendant identifies four particular comments: 1) that Defendant "bashed [Mr. Tolliver's] skull in multiple times"; 2) that Defendant knew "she'd *run off* that Tolliver family"; 3) that Defendant perpetrated a "home invasion"; and 4) that "every piece of evidence . . . is available to anybody." The State responds that none of the remarks were improper or, alternatively, did not affect the jury's verdict.

"Closing arguments are of special importance to the adversarial process and function to sharpen and clarify issues that the jury must resolve." *State v. Johnson*, 401 S.W.3d 1, 20 (Tenn. 2013) (citing *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)).

A prosecutor's closing arguments have great weight on jurors. Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case. However, even though the scope and tenor of their arguments may be limited, prosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices.

A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice. When called upon to review the propriety of a prosecutor's closing argument, the court should consider: (1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial

court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*Banks*, 271 S.W.3d at 131 (citations omitted).

We do not conclude that any of the prosecutor's first three highlighted comments were improper. The medical examiner testified that the blunt force trauma from repeated blows to Mr. Tolliver's head was significant and resulted in brain swelling and a massive bruise. We do not find this remark to be unfairly inflammatory in light of the evidence, and defense counsel countered this characterization in his closing argument.[11] Next, the statement about Defendant having "run off" Mr. Tolliver's family is nothing more than a reasonable inference from the testimonies of Mr. Graham and Kevin Tolliver, which noted that Mr. Tolliver began behaving differently and spending less time with his children after Defendant entered into his life. Last, the prosecutor's characterization of Defendant's presence in Mr. Tolliver's life and home as an "invasion," when viewed in context, was not offered as a literal assertion that Defendant burglarized Mr. Tolliver's home in what may commonly be referred to as a "home invasion." The prosecutor was simply emphasizing a reasonable view of the evidence that Defendant inserted herself into Mr. Tolliver's otherwise peaceful and cheerful life and ultimately destroyed it in her own selfish pursuits.[12]

However, we do conclude that the prosecutor's suggestion that Defendant had the opportunity to conduct her own forensic analysis of the blood-like stains in the home to be an improper suggestion that she failed to produce evidence in her defense. The trial court properly sustained Defendant's objection at trial and gave a curative instruction for the jury to disregard the statement. The jury is presumed to have followed this instruction. *See Banks*, 271 S.W.3d at 137. We also note that this was a brief and obtuse comment on relatively insignificant evidence, which was why the TBI chose not to do a DNA analysis on these particular samples of evidence. Given the circumstances and all other evidence presented to the jury, we have no difficulty concluding that this wayward remark was not reversible error. Defendant is not entitled to relief on this issue.

---

[11] We also note, as the State points out, that Defendant did not object to this remark at trial, and it certainly does not rise to the level of plain error.

[12] The prosecutor made the following statements during his initial closing argument: 1) "If you look at this in the bigger picture, the bigger scope of things, how this actually happened . . . essentially it's a *home invasion*, how this crack head came into the life of Roe Tolliver"; 2) "You saw [Kevin Tolliver] wrought with emotion, with pain, with anxiety, with guilt over why he didn't do something different to rid his father of this *invasion* that occurred upon him"; and 3) "[Mr. Tolliver] raised eight kids on that family land across from his mother, with his sister, and he's got this *invading* his home." He also made one similar reference during his rebuttal closing.

*III.  Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
TIMOTHY L. EASTER, JUDGE